UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**JEDA Capital-56, LLC,**

                                        **Plaintiff,**

                    **-v-**                                    **7:11-CV-596 (NAM/ATB)**

**Village of Potsdam, New York,**

                                        **Defendant.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Office of Jacqueline A. Rappel
Jacqueline A. Rappel, Esq., of counsel
43 Summit Street
Huntington, New York 11743
Attorney for Plaintiff

Lemire, Johnson LLC
Gregg T. Johnson, Esq., of counsel
April J. Laws, Esq., of counsel
Timothy J. Higgins, Esq., of counsel
P.O. Box 2485
2534 Route 9
Malta, New York 12020
Attorneys for Defendant


**Hon. Norman A. Mordue, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

Defendant Village of Potsdam, New York ("Village") moves (Dkt. No. 50) for summary

judgment dismissing the amended complaint (Dkt. No. 14) in this action stemming from a

contract whereby plaintiff JEDA Capital-56, LLC ("JEDA") agreed to construct a water storage

and supply facility on real property owned by JEDA and to lease the realty and improvements to

the Village. JEDA claims the Village breached the contract, wrongfully obtained a release from JEDA, and deprived JEDA of its property without due process or just compensation. As set forth below, the Court grants the Village's motion for summary judgment; dismisses the first, third, fourth, fifth, seventh, and eighth causes of action of the amended complaint with prejudice; and dismisses the second and sixth causes of action without prejudice.

### FACTS

The following facts, drawn from the record and the parties' Statements of Material Facts, are undisputed unless otherwise noted. Michael D. O'Neill ("O'Neill") is the sole member of JEDA. JEDA was formed for the purpose of entering into a contract to build a Lowe's Home Center ("Lowe's") in Potsdam, New York. Lowe's construction plans included a 160,000 gallon water tower for fire protection purposes. JEDA and the Village agreed that, instead of the 160,000 gallon tower, JEDA would construct a 300,000 gallon tower that would service Village residents as well as Lowe's. JEDA purchased 87 acres of land, sold 15.3 acres of that land to Lowe's, and used 27 acres for the water tower project. JEDA obtained mortgage financing from Community Bank, N.A.

On November 19, 2008, JEDA and the Village entered into a Lease ("Lease") providing that JEDA as Landlord would construct "water storage and supply facilities" and lease to the Village as Tenant the facilities and the real estate upon which they were situated, "solely for the purpose of the reception, storage and transmission of potable water to Village and area governmental and municipal residents and customers." The parties later executed two additional agreements: a Lease Addendum ("Addendum") on December 1, 2008, and a Project Completion Agreement ("PCA") on August 18, 2009. O'Neill signed all three agreements as member of

JEDA.

The Lease provided that JEDA would erect and complete the Leased Premises "in accordance with the plans and specifications, as approved by Tenant and/or Tenant's authorized agent" and put the Village "into exclusive physical possession of the Leased Premises on or about October 14, 2008, or as soon as possible thereafter as the Facilities are substantially complete, and in any case not later than December 1, 2008 (the 'Delivery Date')." It added: "Not later than the Delivery Date, Landlord shall provide Tenant with a complete set of 'as built' drawings[.]" Further, within ten business days of the Delivery Date, the Village would provide JEDA with "written notice ('Tenant's Delivery Notice') setting forth either: (i) Tenant's acceptance of the Leased Premises as delivered, subject only to Punch List Items ... ('Tenant's Acceptance Notice'), or (ii) Tenant's refusal to accept the Leased Premises as delivered ('Tenant's Refusal Notice'), specifying the reasons for Tenant's refusal to accept the Leased Premises." It further provided that, "[i]n the event Tenant delivers Tenant's Refusal Notice to Landlord, Landlord shall have thirty (30) days within which to resolve the issue detailed in Tenant's Refusal Notice" and that "[i]mmediately upon resolution of the issues detailed in Tenant's Refusal Notice, Landlord shall provide Tenant with notice that the Leased Premises are ready for delivery ('Redelivery Notice')." The Village could either accept or refuse redelivery. If the Village did not deliver an Acceptance Notice by the first day of the sixth full month immediately following the Delivery Date, then, so long as the Village's Acceptance Notice remained outstanding, either party had the right to terminate the Lease upon ten days prior written notice to the other, and neither party would have any further rights or obligations thereunder. In addition, if at any time during the construction the Village identified any defective or nonconforming work, the Village "shall

provide the Landlord with notice of the same and Landlord shall, at Landlord's sole cost and expense within ten (10) days following its receipt of such notice take all necessary steps to correct such noticed defects."

Under the Lease, "[a]t any time and from time to time, Tenant, at Tenant's cost and expense, may make such structural and non-structural alterations and additions to the Leased Premises as Tenant desires[.]"  Further, the Landlord agreed that it "shall not make any alterations or additions to the Leased Premises without Tenant's prior written consent."

The Lease called for initial rent payments of $9,407.32 per month for ten years commencing on the "Rent Commencement Date," followed by monthly payments of $1,000.00 over the next ten years.  In the section headed "Rent Commencement," the Lease provides: "Tenant shall commence paying fixed rent ... from and after the date on which Tenant serves Tenant's Acceptance Notice on Landlord[.]"

JEDA retained Clough Harbour & Associates ("CHA") as its engineering consultant for the project.  James F. Trasher, P.E. ("Trasher") was CHA's principal engineer.  The Village's authorized agent for the project was the engineering firm Stearns & Wheler, LLC (now known as GHD, Inc.), and its project manager was Kevin Castro, P.E.

JEDA did not put the Village "into exclusive physical possession of the Leased Premises" by December 1, 2008.  On December 1, 2008, the parties executed the Addendum, which amended the Lease by providing: "Landlord shall put Tenant into exclusive physical possession of the Leased Premises as soon as the Facilities are substantially complete.  Notwithstanding the foregoing, in no event shall delivery of the substantially complete Leased Premises occur prior to February 16, 2009, nor later than March 16, 2009."

-4-

JEDA provided a Delivery Notice to the Village on February 10, 2009.  The Village issued a Refusal Notice on February 17, 2009.  JEDA provided a Redelivery Notice on March 17, 2009, and the Village responded with a Refusal Notice on March 23, 2009.  According to JEDA, the Village's refusals to accept delivery were unreasonable and in violation of the Lease.  JEDA's expert, James Trasher, P.E., states in his declaration that the water tower was "substantially complete" as of April 23, 2009.  The Village's project manager, Kevin Castro, P.E., states that it was not substantially complete until November 30, 2009.

The parties entered into negotiations, and on July 10, 2009, Castro wrote to the Village, with a copy to O'Neill, providing a "summary of the status of the items listed in the Draft Project Completion Agreement."  One of the items is as follows:

> Complete as-built surveys for the project have not been received.  However, we have received verification of the overflow elevations of the Clarkson Tank and the Lowes Tank. Based on the as-built overflow elevations, it is determined that the Lowes Tank was constructed with a overflow elevation that was 1.71-feet lower than the Clarkson Tank overflow and 2.03-feet lower than the design elevation. Subsequent hydraulic modeling performed by Clough Harbour  & Associates indicates  that with its present as-built overflow elevation, the Lowes Tank will not function properly in the distribution system. Therefore, the elevation of the Lowes Tank overflow must be raised to the same elevation of the Clarkson Tank (elevation 577.68).

On August 18, 2009, the parties executed the Project Completion Agreement ("PCA").  The PCA recites:

> WHEREAS, The Village of Potsdam ("Village") and JEDA Capital-56, LLC ("JEDA") are parties to a water tower lease agreement dated November 19, 2008. ("Lease").
> WHEREAS, The water tower located on Lot 4 (the "Water Tower" or the "Lot 4 Water Tower") is substantially complete, however the Village as tenant under the Lease has refused to accept delivery of the Water Tower as specified in the Lease until JEDA as landlord completes construction items.
> WHEREAS, The parties desire to enter into this agreement (the "Agreement")

-5-

to clarify what items must be completed before the Village will accept the Water Tower and permit the system to be activated.

This Agreement is constructed such that Section 1 are conditions that must be completed prior to delivery of any water, Section 2 permits filling of the water tank, flushing and pressure Testing (as defined in Section 2 hereof) of the water mains but no other use of water from the system, Section 3 permits disinfection of the water mains, and water tank, Section 4 conditions acceptance of the tested and disinfected mains and tower, Section 5 specifies particular items are to be deemed as punch list items under the Lease, and Section 6 provides indemnification from future legal action.

Section 1 of the PCA begins:

1. PRIOR TO ANY WATER DELIVERY, JEDA shall complete the following items prior to the water for the system being turned on for any purpose; provided, however, that upon completion of the items in this Section l to the Village's satisfaction, JEDA will be authorized to fill the water tank for the purposes of pressure Testing and flushing water lines as set forth in Section 2....

Section 1 includes the requirement that JEDA "must deposit $15,000 with the Village to be available to mitigate potential future odor issues associated with the new sewer system installed with the Lowe's project" and specifies the form of the escrow agreement.  Section 1 lists numerous other items, many of which are designated "Completed."  Outstanding items include "an unpaid balance of $9,913.88 for Stearns & Wheler services on the Water Tower" and replenishment of the engineering escrow with the Village.  Section 1 also addresses the overflow elevation issue, providing:

As-built survey to be delivered by JEDA upon receipt. Must be completed prior to water delivery.

Overflow elevations of the Clarkson Water Tower and the Lot 4 Water Tower have been assessed by Stearns & Wheler based on survey information provided by JEDA.  Initially, S & W raised concerns regarding a discrepancy between the elevation of the Clarkson Water Tower and the elevation of the Lot 4 Water Tower (the "Elevation Discrepancy") and its potential effects on the operation and structure of the Lot 4 Water Tower. To address the

Elevation Discrepancy and any related concerns, JEDA and the Village have agreed as follows: (i) Simultaneously with acceptance by the Village of the Lot 4 Water Tower as complete (subject to punch list items) pursuant to Section 1(e) of this Agreement, JEDA will deliver payment by either check or wire transfer of immediately available funds ... in the amount of $55,000, which payment shall constitute full and final settlement of the Elevation Discrepancy.

Section 2 provides that upon the completion of the items in Section 1, the Village "will permit water to be delivered to the water system, pursuant to the JEDA April 3, 2009 Water and Sewer Testing Protocol, solely to fill the Tower for pressure Testing and flushing of water mains." In Section 3, the PCA provides that upon receipt and approval by S & W of the testing results and report data from the pressure tests set forth in Section 2, the Village "will permit water to be re-introduced to the piping for the purposes of disinfecting the piping system." It adds that "[w]ater tower disinfecting and testing will not begin until water tower painting is complete to the Village's satisfaction." Section 4 provides for the Village's acceptance of delivery of the water tower conditioned upon various items including approval of disinfection testing results and testing and calibration of a fully operational telemetry system. Section 5 set forth "Punch List Items," which the Lease defines as "those incomplete items required under the Plans ... that do not materially interfere with Tenant's ability to use the Leased Premises for Tenant's use."

Section 6 of the PCA provides in full:

6. INDEMNIFICATION: JEDA does hereby covenant and agrees that JEDA will never institute any suit or action at law or equity against Village or its Engineer, nor institute, prosecute or in any way nor aid in the institution or prosecution of any claim, demand, action or cause of action of any kind, whether developed or undeveloped, known or unknown, or which JEDA may have for, or by reason of any matter, whatsoever from the beginning of the world to the day of the date of this agreement arising from or in any way related to the construction of the Water Tower project and related water and sewer systems. Furthermore, JBDA does hereby remise, release and forever discharge the Village or its Engineer from any and all actions, causes of

-7-

action, suits, debits, sums of money, damages, judgments, controversies, agreements, promises, executions and/or claims of any kind, in law or equity, which against the Village or its Engineer JEDA has ever had or shall have upon or by reason of any matters, whatsoever from the beginning of the world as it in any way relates to the construction of the Water Tower project and related water and sewer systems.

In his declaration in opposition to defendant's motion herein, O'Neill states the following with respect to the PCA:

JEDA did review the project completion agreement with its then attorney, Robert E. Barry, Esq. Mr. Barry advised me not to sign the agreement as the Village was not negotiating in good faith and that the only purpose for the agreement was for the Village to attempt to gain a waiver of JEDA's rights to litigation, that the majority of the items were already completed, that it included items totally unrelated to the water tower and were not under the purview of the water tower lease. JEDA did not sign the project completion agreement until August 2009, six (6) months after it was drafted as JEDA did not agree with the terms and conditions of the agreement. However, JEDA was continuously pressured into signing the agreement. Lowe's sent JEDA an email that stated "Lowe's continues to require that JEDA sign the Agreement." The Village's Attorney, Andrew Silver, sent JEDA a letter dated May 13, 2009 that stated that the Village would not accept any further negotiations with respect to the project completion agreement nor furnish water to the project nor issue a certificate of occupancy until it was signed. Michael Weil, Village Administrator, stated in writing on April 15, 2009 that he "strongly recommend[s] that not one drop of water passes to the new facilities until this agreement is signed."

(Citations to exhibits omitted.)

After the parties executed the PCA, the Village again refused to accept delivery of the water tower and issued Refusal Notices to JEDA on November 19, 2009; December 14, 2009; January 14, 2010; and February 8, 2010. According to the Village Administrator, Michael D. Weil, although the Village acknowledged in its January 14, 2010 Refusal Notice that it would accept the water tower for delivery as of November 30, 2009, it "was not obligated to pay rent for the water tower until JEDA fulfilled its obligations under the PCA, including payment of

$55,000.00 to the Village to cover costs related to water elevation discrepancies between the new water tower and the Village's existing water tower (known as 'Clarkson Water Tower')." The Village never sent JEDA an Acceptance Notice and never made any rent payments to JEDA.

Community Bank commenced a foreclosure action on the water tower property in January 2010. On April 26, 2011, the Village and the bank entered into a Pre-Foreclosure Purchase and Sale Agreement. The bank obtained a Judgment of Foreclosure and Sale on October 18, 2011, and the Village purchased the property from the bank thereafter.

## AMENDED COMPLAINT

JEDA commenced this action on May 27, 2011. The amended complaint (Dkt. No. 14), filed August 3, 2011, alleges that JEDA executed the PCA "and agreed to perform additional work required therein under duress, solely because the Village was holding up the opening of the Lowe's store by refusing to accept delivery pursuant to the Lease." The amended complaint further alleges that on January 27, 2010 JEDA "billed the Village for extra work and additional work that the Village requested JEDA to perform, beyond the scope of the Project Completion Agreement."

The first cause of action claims that since March 2009, the Village has failed to pay rent in breach of the Lease, causing Community Bank to begin a foreclosure proceeding. As a result, JEDA sustained damages of $244,590.32 in rent payments plus additional consequential damages.

The second cause of action alleges that JEDA performed all the terms and conditions of the Lease; that the Lease "provided at Article XI that if any structural or non-structural alterations are made, Tenant shall be responsible for the additional cost and expense"; that "during the performance of the construction by the Plaintiff, the Village ordered and directed Plaintiff to

perform work beyond the scope of the plans and specifications"; that "by reason of additions to and deductions from the work required to be performed under the said lease, the Village changed, disrupted, and delayed the subject lease agreement, forcing Plaintiff to expend extra costs in the amount of $228,428.02"; that the Village "has made no payments to JEDA for this extra work, despite due demand"; and that "[t]he balance due to JEDA based upon the Defendant's failure to timely pay rent and for said extra work above and beyond the lease is the sum of $228,428.02, with interest, no part of which has been paid."

The third cause of action seeks rescission of the PCA on the ground of duress, alleging that although the water tower was substantially complete, the Village wrongfully refused to accept delivery of possession and threatened to breach the Lease unless JEDA agreed to execute the PCA, and that the Village's threat caused JEDA to accept the PCA involuntarily. JEDA adds that it had no alternative other than to accept the PCA and that it received no benefits thereunder.

The fourth cause of action seeks rescission of the PCA for lack of consideration. JEDA asserts that the PCA contained additional contract terms that benefitted the Village, but that from JEDA's point of view "contained no consideration in addition to the consideration included in the original Lease agreement."

The fifth cause of action seeks rescission of the PCA on the ground of "contradictory terms." Specifically, JEDA points to provisions in the Lease requiring the Village to pay for any structural or non-structural alterations to the specifications for the water tower and permitting JEDA to sue for rent in the event that the Village breached the Lease. According to JEDA, the provisions in the PCA that imposed changes in the specifications and required JEDA to bear the cost thereof, and required JEDA to waive its right to sue, are directly contradictory to the

-10-

provision in the PCA that the terms and conditions of the Lease "remain in full force and effect." JEDA contends that the "additional work effort and release language contained in the Project Completion Agreement are in direct contradiction to the terms and conditions of the Lease, which remains in full force and effect pursuant to the Project Completion Agreement," and argues that, therefore, "the Project Completion Agreement is a nullity, as it is contradicted by its own terms."

The sixth cause of action for unjust enrichment claims that JEDA performed all labor and furnished all material required by the Village, the fair and reasonable value of which was $1,830,000, no part of which has been paid.  JEDA seeks to recover that amount.

The seventh cause of action under 42 U.S.C. § 1983 claims that the Village confiscated the water tower by removing JEDA's lock from the water tower door, removing JEDA's testing equipment, and placing a Village lock on the water tower door, preventing JEDA's access.[1] JEDA also claims that the Village forced JEDA to sigh a PCA and refused to pay rent timely.  As a result, JEDA claims, the Village has violated JEDA's property rights, causing plaintiff to lose the value of the land, which has been assessed at a value of $1, 830,000.  Plaintiff seeks to recover this sum.

The eighth cause of action alleges a "*de facto* taking" based on the allegations that the Village confiscated the water tower by removing JEDA's lock from the water tower door, removing JEDA's testing equipment, and placing a Village lock on the door.  According to JEDA, New York State's inverse condemnation procedure is unavailable or inadequate, and JEDA has been damaged in the amount of $1,830,000.

**THE MOTION**

---

[1] O'Neill's declaration states that this occurred in October 2009.

**Standard on Summary Judgment**

Summary judgment is appropriate when there is no genuine issue with regard to any material fact, and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Stated otherwise, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  When deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).

**Rescission of the PCA**

"[T]he meaning of a contract that is unambiguous is a question of law for the court to decide." *In re Motors Liquidation Co.*, __ Fed.Appx. __, 2014 WL 4653066, *1 (2d Cir. Sept. 19, 2014) (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (brackets in *In re Motors*)).  "A signed release that is clear and unambiguous and knowingly and voluntarily entered into is binding on the parties unless cause exists to invalidate it on one of the recognized bases for setting aside written agreements, including illegality, fraud, mutual mistake, duress or coercion." *Nelson v. Lattner Enters. of N.Y.*, 969 N.Y.S.2d 614, 616 (3d Dep't 2013) (citing *Centro Empresarial Cempresa S.A. v. América Móvil*, S.A.B. de C.V., 17 N.Y.3d 269, 276 (2011)).  "Although a defendant has the initial burden of establishing that it has been released from any claims, a signed release shifts the burden of going forward to the plaintiff to show that there has been fraud, duress or some other fact which will be sufficient to void the release." *Centro Impresarial*, 17 N.Y.2d at 276 (citation, alterations, and quotation marks omitted).

-12-

JEDA does not contend that it did not enter into the PCA knowingly, nor could it reasonably advance such a claim.  O'Neill is a sophisticated and experienced developer and engineer; the PCA was under negotiation between the parties for six months; O'Neill knew the PCA included a release; and prior to signing, O'Neill consulted his lawyer, who recommended against his signing it on the ground that "the only purpose for the agreement was for the Village to attempt to gain a waiver of JEDA's rights to litigation."

It is JEDA's contention that the element of voluntariness is lacking.  The third cause of action of the amended complaint seeks rescission on the ground that JEDA entered the PCA involuntarily due to economic duress.

The doctrine of economic duress "is grounded in the principle that courts 'will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury.'"  *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 142 (2d Cir. 2011) (quoting *VKK Corp. v. National Football League*, 244 F.3d 114, 122 (2d Cir. 2001)).  To avoid a contract on the ground of economic duress, the complaining party must establish the following elements: "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative."  *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989) (quoted in *Interpharm*, 655 F.3d at 142).  It has long been the law that "a threat to break a conract does not in itself constitute duress."  *Hartsville Oil Mill v. United States*, 271 U.S. 43, 49 (1926).  "Before the coercive effect of the threatened action can be inferred, there must be evidence of some probable consequences of it to person or property for which the remedy afforded by the courts is inadequate."  *Id.*

-13-

Even where a contract or release is the result of economic duress, under some circumstances it may be deemed ratified and therefore binding on the party seeking to avoid it. In *VKK Corp.*, the Second Circuit explains:

> Under New York law, a contract or release, the execution of which is induced by duress, is voidable. However, the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so. If the releasing party does not promptly repudiate the contract or release, he will be deemed to have ratified it. A party may ratify a contract or release entered into under duress by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it.
>
> ***
>
> Not infrequently, when two commercial parties enter into an agreement, one of them has a decided economic advantage over the other. The weaker party often must enter into the bargain because of his economic circumstances, a disparity in bargaining power to his disadvantage, or some combination of the two.
>
> Because an element of economic duress is thus present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release on that basis is reserved for extreme and extraordinary cases. Otherwise, the stronger party to a contract or release would routinely be at risk of having its rights under the contract or release challenged long after the instrument became effective. The requirement that the party claiming duress disclaim the contract or release about which he is complaining promptly or be held to have forfeited his right to do so protects the stability and reliability of such agreements by denying the weaker party the "heads I win, tails you lose" option of waiting to see how the arrangement works out and then deciding whether to seek to undo it. Under this rule, shortly after the execution of a contract or release, the rights and duties under it become free of the doubt engendered by possible assertions of duress. And ... the requirement of prompt disavowal after execution is fair to the disadvantaged party, who will ordinarily know at the time he executes the instrument that he is being economically coerced. He will therefore be able to disclaim the instrument immediately if he was forced into it by economic duress and wishes to avoid its effect.

*VKK Corp.*, 244 F.3d at 122-24 (citations, alterations, quotation marks, and footnote omitted).

As discussed below, the Court finds that JEDA's acceptance of the PCA on August 18,

2009 was not based on economic duress, and further that JEDA's conduct thereafter ratified the

PCA.  In his July 25, 2013 deposition, O'Neill testified:

> Q In – in Exhibit number 3, the Project Completion Agreement, did you read on the last page, the indemnification – second to last page, the indemnification language before you signed the document for JEDA?
> A Yes.
> Q Did you know that that was a promise not to sue the Village of Potsdam with respect to any claim or disputed claim arising out of construction or completion of the water tower?
> ***
> A Yes .
> Q Did you intend to live up to that promise when you signed it?
> A No.
> Q Then why did you sign it?
> A I was informed by the Village of Potsdam on several occasions by Andrew Silver, the Village of Potsdam attorney that JEDA nor Lowe's could receive a certificate of occupancy or water for purposes of testing the system unless the Project Completion Agreement ... was signed by JEDA, so I felt distressed, coerced into signing it.
> ***
> Q But when you look through the Project Completion Agreement, can you identify for me anything specifically that's in there that in your mind when you signed it you had no intention of complying with other than the promise not to sue?
> A The payment of -- lD, the payment of the Stearns & Wheler bills I did not feel – I did pay them, but I did not feel that was appropriate.
> Q So you did pay them?
> A Yes.
> ***
> Q Did you tell anybody affiliated with the Village of Potsdam that you felt that you were forced to sign the Project Completion Agreement because of economic distress?
> A I don't recall. I know that prior to this I had told them I objected to the Stearns & Wheler funds. I indicated they were unreasonable in a number of requests, and that I would sue them prior to this document.
> Q My question is specific to this document though, did you – like you're saying today, you felt like you were under economic distress, did you say that to anybody affiliated with the village specific as to the promise not to sue before you signed it?
> A No, to the contrary I told them that I was going to sue them.
> Q No, but my question was: Did you tell them you felt that you had no choice but to sign this because of the economic distress you were under?

A I guess it would come down to an interpretation of what I specifically said to them. I said on more than one occasion in e-mail, verbal, and I believe in correspondence that the village was unfair and that I was going to sue them, so that specifically saying distress, Project Completion Agreement, I don 't recall.

Q Okay. Do you think that the language in the Project Completion Agreement and specifically the promise not to sue was included in the document because of your prior threats to sue the village?

A Probably, yes.

Q Okay. So seeing the language, the indemnification and the covenant not to sue, seeing that language in the Project Completion Agreement could not have been a surprise to you?

A No.

Q You knew why it was in there?

A Yes.

***

Q But you, when you signed it, knew that you were going to sue the village anyway?

A I only was going to sue the village if I felt they breached the lease, which in my opinion they did.

Q After the time you signed the Project Completion Agreement?

A Probably prior, during, and after, that entire sequence because I had indicated to the village pursuant to the lease that the water tower was substantially complete. In anticipation they were going to pay the rent. Once the rent was not received and the village issued several tenant refusal notices that were, what I consider, improper per the lease, I knew we were headed for litigation just because of the conduct of the village.

Q So at the time you signed the Project Completion Agreement you knew that you were going to sue the village?

A Well, not necessarily. Had the village lived up to the provisions of the lease, the provisions of the SEQR documents that they accepted, reviewed by and approved by resolution, I would not have had to have sued the village, but the village did not pay the rent. I believe they misinterpreted intentionally the language of the document, and I believe that they made significant changes to the project with effect to the waterlines, the telemetry, and other issues that significantly increased the cost, and I believe that their conduct was inappropriate, if not, illegal.

Q But by August 2009 when you were presented with the Project Completion Agreement, in your mind and in your communications with the village, you had already claimed that they – that the village was not performing under the lease and the lease addendum, correct?

A Yes.

Q So in your mind you had already crystallized the thought that there's a breach on the part of the village and your response to that breach, one of your

methods of recourse would have been a lawsuit?
A Yes.
Q What – what economic distress, that's what you claim, don't you, you claim
economic distress was responsible for you signing this Project Completion
Agreement?
A I would just – it was not necessarily just economic distress, it was basically
the village stating if you don't sign this document, we're not going to give you
water nor can Lowe's open its facility, so if that's economic distress, yes, I
considered it went far beyond economic distress.
Q Right. It impacted your ability to earn money on this project –
A Yes.

The above-quoted testimony of O'Neill, a sophisticated and experienced developer,

demonstrates that he did not sign the PCA out of economic duress.  Rather, he signed it in the

expectation that it would lead to the Village's providing water, accepting delivery, issuing a

certificate of occupancy, and paying rent.  At the time the PCA was executed, JEDA's entitlement

to these actions by the Village was seriously in dispute.  In signing the PCA, O'Neill gained a

resolution of certain disputed items, in particular the elevation discrepancy, and a "roadmap" to

obtaining water, acceptance of delivery, certificate of occupancy, and payment of rent.

O'Neill's testimony further establishes that he knew he had the alternative of suing the

Village, but decided that, at the time, it was more advantageous to JEDA to sign the PCA.

Therefore, he signed, with the intention that JEDA would later dishonor the PCA's release if

doing so became more advantageous than performing under the PCA.  Clearly, O'Neill's

execution of the PCA resulted not from the lack of an alternative, but from a calculated business

decision that, at that time, JEDA had more to gain from entering into the PCA than from suing the

Village.

In addition, the record demonstrates that, rather than refusing to sign the PCA or quickly

disclaiming it, JEDA then undertook to perform under it, serving four more Redelivery Notices

-17-

between November 2009 and January 2010 in an effort to obtain the Village's acceptance of

delivery.  Eventually, JEDA concluded that it had more to gain from dishonoring the release and

suing the Village than from continuing to perform under the PCA, and JEDA filed the instant

complaint on May 27, 2011.  By pursuing what the Second Circuit calls the "'heads I win, tails

you lose' option of waiting to see how the arrangement works out and then deciding whether to

seek to undo it," JEDA forfeited any right to avoid the PCA.  *VKK Corp.*, 244 F.3d at 123; *see*

*also Restatement (Second) of Contracts* (1981) (Database updated June 2014), § 381(3)(a) (listing

"the extent to which the delay enabled or might have enabled the party with the power of

avoidance to speculate at the other party's risk" as a "significant" factor in determining what is a

reasonable time to avoid a contract for duress).  No reasonable factfinder could conclude that

JEDA's execution of the PCA arose from economic duress due to lack of an alternative, or that

JEDA's conduct thereafter did not constitute ratification.  As a matter of law, on the undisputed

facts, and drawing all factual inferences in JEDA's favor, the Court finds that JEDA is not

entitled to rescission of the PCA based on economic duress.

The fourth cause of action of the amended complaint seeks rescission of the PCA on the

ground of lack of consideration.  As noted above, in signing the PCA, O'Neill, a sophisticated and

experienced developer, gained a resolution of disputed items, in particular the elevation

discrepancy raised in Castro's July 10, 2009 letter, as well as a "roadmap" to obtaining water,

acceptance of delivery, certificate of occupancy, and payment of rent.  No reasonable factfinder

could conclude that JEDA's execution of the PCA lacked consideration.  As a matter of law, on

the undisputed facts, and drawing all factual inferences in JEDA's favor, the Court finds that

JEDA is not entitled to rescission of the PCA on this ground.  Summary judgment dismissing this

cause of action is granted.

The fifth cause of action seeks rescission of the PCA on the ground that it contains "contradictory terms."  Specifically, JEDA points to Section 7, the concluding section of the PCA, which states that "the terms and conditions of the Lease agreement and any amendments thereto, between the parties hereto remain in full force and effect," and argues that this directly contradicts the PCA's "additional work effort and release language" which conflicts with the terms and conditions of the Lease.  It is a basic rule of contract construction, however, that "a specific contract provision should prevail over a general one."  *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 2014 WL 3844155, *11 (2d Cir. Aug. 6, 2014) (citing *J. Aron & Co. v. The Askvin*, 267 F.2d 276, 277 (2d Cir.1959) ("Effect should be given to all the contract terms and the specific controls the general.")).  Moreover, courts "should construe a contract so as to give meaning to all of its language and avoid an interpretation that effectively renders meaningless a part of the contract." *Republic of Rwanda v. Ferone*, 307 Fed.Appx. 600, 602 (2d Cir. 2009) (citation omitted).  Here, it is clear that Section 7 is a general term intended not to invalidate any specific terms of the PCA that conflict with the Lease, but rather to reaffirm all other terms in the Lease not specifically addressed in the PCA.  The fifth cause of action lacks merit as a matter of law and is dismissed.

**The Effect of the Release Upon the Claims in the Amended Complaint**

Having dismissed on their merits the three causes of action seeking rescission of the PCA, the Court turns to consider the effect of the release on the remaining claims.  The Village argues that all remaining claims in the amended complaint must be dismissed based on the release.  JEDA argues that, even accepting *arguendo* that the PCA is valid, it does not operate to release

-19-

the claims in the amended complaint.  JEDA contends:

> To start, the project completion agreement only applies to release claims in connection with "the construction of the water tower".  The claims in the instant matter do not go directly to issues with the construction of the water tower.  This litigation relates to the lease, offsite exactions, extras and the unreasonable acts of the Village in withholding acceptance of substantial completion, not commencing lease payments and forcing JEDA into foreclosure. Clearly these issues do not arise out of "the construction of the water tower."

The PCA's release by its own terms is not limited to claims "in connection with the construction of the water tower."   The release covers not only all claims which JEDA "has ever had or shall have" "of any kind" "by reason of any matters" relating "in any way" to the "construction of the Water Tower project," but also all such claims relating to the "related water and sewer systems."  The Lease itself is a matter relating to the "construction of the Water Tower project and related water and sewer systems"; plainly, then, the release covers all claims relating to the Lease and the parties' obligations thereunder, including claims based on allegations that the Village unreasonably withheld acceptance of substantial completion of the water tower, improperly failed to commence Lease payments for the water tower project, and wrongfully forced JEDA into foreclosure by failing to make such payments.

*First Cause of Action*

The Court holds that the release unambiguously covers the amended complaint's first cause of action for unpaid rent due under the Lease.  Because it is based on the Village's obligations under the Lease, the first cause of action is "related to the construction of the Water Tower project."  The first cause of action is within the ambit of the release, and is dismissed as a matter of law.

*Second and Sixth Causes of Action*

-20-

As noted, in its Memorandum of Law, JEDA argues that "offsite exactions" and "extras" are not covered by the release. The second cause of action alleges that "by reason of additions to and deductions from the work required to be performed under the said lease, the Village changed, disrupted, and delayed the subject lease agreement"; that the Village "has made no payments to JEDA for this extra work, despite due demand"; and that "[t]he balance due to JEDA based upon the Defendant's failure to timely pay rent and for said extra work above and beyond the lease is the sum of $228,428.02[.]" It is not clear from this cause of action or the record to what extent such claims "relate[] to the construction of the Water Tower project and related water and sewer systems" and are thus released by the PCA.

The sixth cause of action for unjust enrichment claims that JEDA performed all labor and furnished all material required by the Village, the fair and reasonable value of which was $1,830,000, no part of which has been paid. The Court cannot determine from the record whether all of the items underlying the sixth cause of action relate to the "construction of the Water Tower project and related water and sewer systems" and are thus barred by the release. Defendant has not established its entitlement to summary judgment dismissing the second and sixth cause of action.

*Seventh and Eighth Causes of Action*

The seventh cause of action, pursuant to 42 U.S.C. § 1983, claims that the Village infringed JEDA's property rights by confiscating the water tower through preventing JEDA's access, forcing JEDA to sign the PCA, and refusing to pay rent timely. The eighth cause of action alleges a *de facto* taking based on the Village's alleged confiscation of the water tower. Both causes of action on their face relate to the construction of the water tower project and thus

fall within the language of the release. The Court is aware that these two causes of action assert fundamental constitutional due process rights, and that courts must "indulge every reasonable presumption against waiver" of a fundamental constitutional right. *See Fuentes v. Shevin*, 407 U.S. 67, 95 n.31 (1972) (citation and quotation marks omitted). Nevertheless, such rights "may be contractually waived where the waiver is voluntary, knowing, and intelligently made." *Typhair v. Town of Gouverneur*, 322 Fed.Appx. 26, 27 (2d Cir. 2009) (upholding waiver of right to due process). In *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185-87 (1972), the Supreme Court upheld a contractual waiver of due process rights, taking into account that the waiving party was a corporation, had the benefit of counsel, and was aware of the significance of the waiver provision. The *Overmyer* factors support the conclusion, based on clear and convincing record evidence, that JEDA's release was voluntary, knowing, and intelligently made. *See Dodson v. Board of Educ.*, 2014 WL 4207638, *4 (E.D.N.Y. Aug. 25, 2014), *and Intermor v. Incorporated Vill. of Malverne*, 2007 WL 2288065, *8 (E.D.N.Y. Aug. 8, 2007), *and cases cited therein.* As previously noted, it is undisputed that O'Neill is an experienced developer, had the benefit of counsel, and negotiated the PCA over the course of many months. He was fully aware of the significance of the release. *Compare Fuentes*, 407 U.S. at 95. The undisputed facts establish that JEDA effectively waived the claims asserted in the seventh and eighth causes of action as a matter of law; no reasonable factfinder could find otherwise. The seventh and eighth causes of action are dismissed.

## CONCLUSION

The Court grants summary judgment dismissing with prejudice the third, fourth, and fifth causes of action for rescission of the PCA. Having found that the release is valid and that it bars

all claims in the first, seventh, and eighth causes of action in the amended complaint, the Court grants summary judgment dismissing these causes of action with prejudice.

The Court cannot determine on this record whether all claims in second and sixth causes of action are covered by the release in the PCA, because it is not clear whether all such claims "relate[] to the construction of the Water Tower project and related water and sewer systems." Having dismissed the seventh and eighth causes of action, the only causes of action over which it has original jurisdiction, the Court must determine whether to exercise supplemental jurisdiction over the remaining claims – the state law claims in the second and sixth causes of action that may not be covered by the release. See 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim ... [if] the district court has dismissed all claims over which it has original jurisdiction."). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Here, the benefit to the parties of the discovery and motion practice already conducted will not be lost if this Court declines supplemental jurisdiction. The remaining state-law claims involve local governmental and business interests and have no relation to federal law. Accordingly, this Court exercises its discretion to dismiss the second and sixth causes of action without prejudice.

It is therefore

ORDERED that defendant's motion (Dkt. No. 50) for summary judgment is granted; and it is further

ORDERED that the first, third, fourth, fifth, seventh, and eighth causes of action are dismissed with prejudice; and it is further

ORDERED that the second and sixth causes of action are dismissed without prejudice; and it is further

ORDERED that the Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

Date:   September 30, 2014
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge

-24-